## HANSEN v. SLICK.

(District Court, W. D. Pennsylvania.   July 23, 1914.)

### No. 173.

1. **PATENTS (§ 114\*)—SUIT TO OBTAIN PATENT—SCOPE.**
    A suit in equity to obtain a patent, brought under Rev. St. § 4915 (U. S. Comp. St. 1901, p. 3392), is in the nature of a proceeding de novo to determine whether or not the complainant is entitled to a patent, and involves, in addition to other issues which may be raised, the question of the patentability of the invention covered by the claims.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 166;   Dec. Dig. § 114.\*]

2. **PATENTS (§ 34\*)—INVENTION—SCOPE OF PRIOR ART.**
    In considering the question of invention relating to the reforging or re-rolling of a worn article of iron or steel, the court cannot exclude from consideration patents in which the application of principles is involved which may be applied to the case in hand merely because they relate to forms of iron or steel products different from that in the case before it.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 38;   Dec. Dig. § 34.\*]

3. **PATENTS (§ 328\*) — INVENTION — PROCESS FOR REFORGING WORN CAR WHEELS.**
    The Slick patent, No. 1,055,672, for a method of treating steel car wheels, which consists of reforging or re-rolling worn-out wheels, thereby reshaping the flange and tread so that they may be used again, *held* void for lack of invention in view of the prior art.

4. **PATENTS (§ 328\*)—PRIORITY OF INVENTION—LACHES.**
    Complainant, Hansen, *held*, on the evidence, to have first conceived the method of reforging worn car wheels embodied in the Slick patent, No. 1,055,672, and to have acted with due diligence in reducing the same to practice which would entitle him to the patent therefor if the process disclosed patentable invention.

5. **EQUITY (§ 67\*)—"LACHES."**
    "Laches" has been defined to be such negligence or omission to assert a right as, taken in conjunction with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 191–196;   Dec. Dig. § 67.\*
    For other definitions, see Words and Phrases, vol. 5, pp. 3969–3972; vol. 8, p. 7700.]

In Equity.   Suit by John M. Hansen against Edwin E. Slick.   On final hearing.   Bill dismissed.

James I. Kay, of Pittsburgh, Pa., for plaintiff.
C. C. Linthicum, of Chicago, Ill., for defendant.

ORR, District Judge.   Plaintiff filed a bill under the provisions of section 4915 of the Revised Statutes (U. S. Compiled Statutes, 1901,

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

page 3392). The defendant has filed his answer, and the case has come on for trial under the rules. The bill of complaint sets forth that the complainant was the original inventor of a new and useful improvement in a method of reworking worn forged car wheels, that he made due application therefor, and that pending his application his claims were adjudged to interfere with claims of a certain application filed by the defendant for a method of treating steel car wheels, which claims are as follows:

"1. The herein described method of re-forming a worn car wheel, consisting in heating the worn wheel and forging the same to increase the diameter of and reshape the tread, and reshape and thicken the flange."

"4. The herein described method of re-forming a worn car wheel, consisting in heating the same and forging the rim portion thereof outwardly to increase the diameter of and reshape the tread, and reshape and thicken the flange."

"7. The herein described method of forming and reforming a car wheel, consisting in forming a wheel having rim and hub portions, and after wear heating the worn wheel and subjecting the rim portion to pressure to force the metal outward and so reshape the tread and flange portions, and subjecting the hub portion to pressure inward to decrease the axle eye.

"8. The herein described method of forming and reforming a car wheel, consisting in forming a wheel with a hub portion and an axle eye, and after wear heating the worn wheel and subjecting the hub portion to pressure in a manner to force the metal inward and so decrease the axle eye.

"9. The method of utilizing worn-out car wheels, consisting in heating them, reshaping the tread and flange, and simultaneously increasing the diameter.

"10. The method of utilizing worn steel car wheels, consisting in heating the wheels, then rolling them between opposing die surfaces to reshape and simultaneously increase the diameter of the flange and tread portions.

"11. The method of restoring worn car wheels, consisting in reheating the wheels and applying pressure thereto to force the metal of the wheel into the worn portions to give the proper form of tread and flange.

"12. The method of remaking worn steel wheels, consisting in reheating them and then applying pressure to force the metal of the wheel into substantially the original shape and contour of the tread and flange.

"13. The method of remaking worn steel wheels, consisting in reheating the wheels, applying pressure thereto and forcing the metal in a radial direction to reshape the tread and flange and give them the proper contour.

"14. The method of remaking worn steel wheels, consisting in reheating them, applying pressure thereto, and causing the metal to flow outwardly in a radial direction in the worn portions and reshape them to the desired contour.

"15. The method of remaking worn steel wheels, consisting in reheating them and then applying pressure, to force the metal of the wheel radially outward to increase the diameter of the wheel and reshape the tread and flange into the desired contour."

The bill further sets forth that after the declaration of said interference the case was heard successively by the Examiner of Interferences, the Examiner in Chief, and the Commissioner of Patents, each of which tribunals decided in favor of the plaintiff; that finally the case came on to be heard by the Court of Appeals of the District of Columbia, which decided against the plaintiff and rendered a decision holding that the defendant was the first and original inventor of the matter specified in the claims in said interference proceeding. The bill further avers that the decision of the Court of Appeals was duly certified to the Patent Office and that in pursuance thereof the Commissioner of Patents refused to grant the plaintiff a patent in pursuance of his application. The bill contains the further formal averments as to

invention, as to absence of prior invention, publication, and public use. It also contains an averment as to due diligence on the part of the plaintiff, and prays that this court should decree the plaintiff to be entitled to letters patent, and that the defendant should be restrained from asserting any title or monopoly against the plaintiff as a result of said interference proceedings and for further relief. The answer denies the averment of invention by the plaintiff, admits the averments with respect to the proceedings had in the several tribunals as stated in the bill, and admits that the Commissioner of Patents, in pursuance of the decision of said Court of Appeals, issued to the defendant letters patent of the United States, No. 1,055,672, for a new and useful method of treating steel car wheels. The answer avers that the defendant was the original and sole inventor, and that the action of the said Court of Appeals was correct and proper, and sets up that the plaintiff was lacking in diligence and guilty of laches in doing nothing toward the perfection of his invention between the date of his alleged conception and the date of filing his application for letters patent.

It will thus be seen that both parties to this proceeding insisted that the subject-matter of the interference proceeding was patentable. The only real issue raised by the bill and answer is whether or not the plaintiff was guilty of laches in the reduction to practice of the invention between the time of his alleged conception and the date of his reduction to practice. The section of the Revised Statutes under which the bill is filed is as follows:

"Section 4915. Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases, where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expense of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

[1] Section 9 of the "act to establish a Court of Appeals for the District of Columbia" and for other purposes, approved February 9, 1893, chapter 74, 27 St. at Large, 434, 436 (U. S. Comp. St. 1901, p. 3391), vests in the Court of Appeals created by that act the determination of appeals from the decisions of the Commissioner of Patents which had previously vested in the general term of the Supreme Court of the District of Columbia. In Frasch v. Moore, 211 U. S. 1, 29 Sup. Ct. 6, 53 L. Ed. 65, and Johnson v. Mueser, 212 U. S. 283, 29 Sup. Ct. 390, 53 L. Ed. 514, it is held that the decision of the Court of Appeals of the District of Columbia in appeals from the Commissioner of Patents were not reviewable by the Supreme Court, and the reason given for so holding is because the final judgment of that court "in either an ex parte or an interference proceeding is not conclusive of their patentability or priority." We see, therefore, that inasmuch as

such decision is interlocutory, and inasmuch as section 4915 provides a method, it must be concluded that that method is, if not entirely so, yet in the nature of a proceeding de novo to determine whether or not the applicant is entitled to a patent. This involves much more than the mere issue raised by the plaintiff and defendant in the case at bar. It involves at least the question of the patentability of the inventions covered by the claims. This seems to have been squarely ruled in Hill v. Wooster, 132 U. S. 693, 10 Sup. Ct. 228, 33 L. Ed. 502. It is the view expressed by the late Judge Lanning in Davis v. Garrett (C. C.) 152 Fed. 723.

[3] The principal question therefore is whether or not the patent No. 1,055,672, issued to Slick, for a method of treating steel car wheels, is valid. In the specifications Slick states:

"My invention relates to utilizing worn-out steel car wheels, which have either been worn with flat spots or have been uniformly worn down to less than the desired diameter, or have otherwise been rendered unfit for further use. These wheels are ordinarily worked up into scrap for charging at the open hearth, and hence are of small value.

"My invention is designed to utilize these wheels by reforging or re-rolling them, and thereby reshaping the flange and tread and preferably increasing the diameter. I thus convert the old wheel into a new wheel of practically the same value as when originally made, and at a comparatively low expense, and the wearing surfaces of the reformed wheel are made as dense as the wearing surfaces of the original wheel.

" * * * I reheat this wheel to the ordinary forging or rolling temperature, and then force the metal of the web out into the flange and tread and reshape this flange and tread to the desired form. In this re-forming, I also preferably apply pressure to the hub to decrease the diameter of the hole therethrough so that this can be rebored to the desired size; and I also may force metal from the hub into the web of the wheel. In carrying out this reshaping operation, I may roll the metal outwardly or forge it outwardly, or both; but the operation is preferably carried out within dies having a shaping cavity, or cavities which give the proper flange and tread shape."

The patentee sets forth the advantages of the process as follows:

"The advantages of my invention will be apparent to those skilled in the art, since instead of converting the worn wheels into scrap they are made of practically original value by a single mechanical operation, which may be cheaply and rapidly carried out. The amount of work done in reshaping the tread and flange to their original form is of course very much less than that necessary to originally form the wheel from the blank."

He further says:

"Many changes may be made in the form and arrangement of the die or dies, the mechanism for re-rolling or reforging the wheel, and wheels of different shapes may be reformed without departing from my invention, since I consider myself the first to reshape the tread and flange of a worn wheel while hot."

The following are the claims:

"1. The method of utilizing worn-out car wheels, consisting in heating them, reshaping the tread and flange, and simultaneously increasing the diameter, substantially as described.

"2. The method of utilizing worn car wheels, consisting in heating them, then thinning the web by rolling and forcing the displaced metal radially outward into the tread and flange to reshape the periphery of the wheel, substantially as described.

"3. The method of utilizing worn car wheels, consisting in heating the wheel, then thinning the web by rolling and forcing the displaced metal radially outward into the tread and flange to reshape the flange and tread, and simultaneously increase the diameter of the wheel, substantially as described.

"4. The method of utilizing worn steel car wheels, consisting in heating the wheels, then rolling them between opposing die surfaces to reshape and simultaneously increase the diameter of the flange and tread portions, substantially as described.

"5. The method of restoring worn car wheels, consisting in reheating the wheels and applying pressure thereto to force the metal of the wheel into the worn portions to give the proper form of tread and flange, substantially as described.

"6. The method of remaking worn steel wheels, consisting in reheating them and then applying pressure to force the metal of the wheel into substantially the original shape and contour of the tread and flange, substantially as described.

"7. The method of remaking worn steel wheels, consisting in reheating the wheels, applying pressure thereto, and forcing the metal in a radial direction to reshape the tread and flange and give them the proper contour, substantially as described.

"8. The method of remaking worn steel wheels, consisting in reheating them, applying pressure thereto, and causing the metal to flow outwardly in a radial direction in the worn portions and reshape them to the desired contour, substantially as described.

"9. The method of remaking worn steel wheels, consisting in reheating them and then applying pressure to force the metal of the wheel radially outward to increase the diameter of the wheel and reshape the tread and flange into the desired contour, substantially as described.

"10. The herein described method of reforming a worn car wheel, consisting in heating the worn wheel and forging the same to increase the diameter of and reshape the tread, and reshape and thicken the flange.

"11. The herein described method of reforming a worn car wheel, consisting in heating the same and forging the rim portion thereof outwardly to increase the diameter of and reshape the tread, and reshape and thicken the flange.

"12. The herein described method of forming and reforming a car wheel, consisting in forming a wheel having rim and hub portions, and after wear heating the worn wheel and subjecting the rim portion to pressure to force the metal outward and so reshape the tread and flange portions, and subjecting the hub portion to pressure inward to increase the axle eye.

"13. The herein described method of forming and reforming a car wheel, consisting in forming a wheel with a hub portion and an axle eye, and after wear heating the worn wheel and subjecting the hub portion to pressure in a manner to force the metal inward and so decrease the axle eye."

It is unnecessary to consider and analyze each of the claims separately. The variations between them are slight, and all must fall if it be found that the method described in the specifications is not invention. It is of course beyond question that the reshaping of old car wheels to allow of their use in the same manner as new wheels are used and in association with new wheels is of great value. The measure of economy, while not definitely fixed in the evidence, must surely be great. It is true that the treatment of worn-out car wheels does not appear to have been adopted, or even considered as feasible, until about the time the parties to this suit filed their applications in the Patent Office. This court has concluded that the reason for the failure to reshape worn-out car wheels was the doubt that existed as to the durability of the reshaped wheel. This is fairly found from the evidence when taken in connection with the disclosures of the prior art.

The re-treatment of metal articles, which have already been sub-

jected to heavy use, has always presented the problem as to whether or not, after re-treatment, the mechanical and physical properties of the metal remain the same. In other words, it was doubted whether a different crystallization or a different chemical relation might not exist in the re-treated article which had not existed in the article as originally made. Such doubts could only be resolved by careful tests, and especially by the important test of use. So far as the flow of metal is concerned, no doubt has ever existed that metal at greater or less degree of heat, would flow under pressure. The familiar illustration of that fact is found in the coinage of money, and as well in the effect of the submission of a penny after the manner of boys to the pressure of a railroad train.

The evidence discloses that used articles of steel and iron have been re-treated to bring them again to the necessary length, and that others have been re-treated to bring them again to the necessary width; that others again may be brought to the same circumference was to be expected. A search of the patent for something peculiar in the treatment proposed by the patentee is in vain. The used wheel is reheated to the ordinary forging or rolling temperature. Pressure is then applied as needed. If the process of rolling be used, the pressure of the rolls is given as required. If the process of forging by dies is used, the same is true.

But it is said, in order to make the reshaped wheel answer its purpose, there must have been an excess of metal placed in the original wheel, because some of the metal of the original wheel is lost by the wear and tear of the track and brake, and it is urged that because of the insertion of excess metal in the original wheel, invention should be found. To this we cannot agree. As men of the former generation and as boys of the present had some excess of metal in the molding of lead bullets, and as every blank which is used in dies has more or less excess metal, else it might not completely fill the dies and receive the shape intended, so the used car wheel in principle is nothing more than a blank of metal intended to be forged or rolled into a new, though slightly different, shape. This theory that the addition of more metal than is necessary to the original wheel should be deemed a feature of invention is not apparent in the Slick patent, but was made a feature in the Hansen application, and is urged on the part of Hansen in the present case. We cannot regard it as of importance.

This court has failed to find anything substantially new in the process. In United States patent to McConnell, No. 393,775, under date of December 4, 1883, for reamer and method of constructing the same, there is a disclosure of a method of expanding reamers by pressure to compensate for wear and tear.

In United States patent No. 522,228, to McKenna, for a process of of renewing old steel rails, there is a disclosure of a re-treatment of the metal by pressure so that it may be reused, although with reduced cross-section.

[2] It is urged, however, that such patents as those last referred to do not relate to the art involved, and the phrase "the art of making car wheels" is used. Without further comment than that the subdivi-

sions of the subjects of patents by the profession, and perhaps by the Patent Office, are becoming somewhat unduly extended, the court cannot exclude patents in which the application of principles are involved which may be applied to the case in hand simply because they relate to a form of iron or steel product which is not found in the present case. Referring, however, to patents more intimately connected with wheels, we find that United States patent to Baker, No. 793,814, for a method of forging wheel blanks, discloses a method of causing excess metal to flow inwardly toward the center of the hub, and also outwardly in latterly opposite directions under pressure.

United States patent to Wheeler, No. 664,799, for car wheel rolling mill and method of rolling car wheel blanks, discloses a method for causing the metal while under pressure to be expanded toward the flange or toward the hub of the wheel.

In U. S. patent to Schoen, No. 848,927, under date of April 2, 1907, for method for making car wheels, the patentee discloses a method of making wheels in which subjecting the blank to pressure in circular dies is clearly shown. The wheels contemplated in that patent are made from wrought metal, but the fact of die pressure upon the metal is clearly shown.

In the consideration of the question here presented with the utmost care and with a realization that all the witnesses called were favorable to invention, yet the court cannot find anything substantially new in the patent. The use of great presses is old. The use of dies with different shapes with which the pressed metal is bound to conform is old. The only thing that is new is the fact that people began to use old processes in order that old wheels may be renewed and subjected to a longer life. The treatment of worn-out car wheels was a mere step in the art of subjecting metals under pressure to force them to reach the desired dimensions. That such treatment has resulted in great economy should not control the judgment of the court upon the question of invention. In the present state of the art, in which great presses with a variety of dies are used, the steps taken by Hansen and Slick were little more than the step of the country carpenter who straightens a used and bent nail and uses it a second time. It is therefore the duty of the court to dismiss the bill because invention is not found.

[4] We come next to the only issue raised by the parties, and that is the question of priority of the alleged invention, and it is proper that that question should be decided, although, as has been pointed out, the case goes off on another question. Both parties to this proceeding are skilled in the manufacture of steel car wheels. The plaintiff is president of the Forge Steel Wheel Company, the Standard Steel Car Company, and the Standard Truck Company. He filed his application in the Patent Office on the 13th of June, 1908, serial number 438,421. The defendant filed his application on the 12th of December, 1907, serial number 406,132. The plaintiff conceived the method of the patent on the 11th of August, 1906. The defendant conceived the method of the patent November, 1906. The plaintiff constructively reduced his method to practice by filing his application June 13, 1908;

the defendant constructively reduced his method to practice by filing his application December 12, 1907. It is plain that priority should be awarded to Hansen unless his right was lost by some neglect on his part. At or about the time of his conception he began the erection of a large steel plant for the making of forged steel car wheels. Embraced in that plant was a variety of necessary apparatus. Some of that apparatus, particularly the presses, were necessarily of great size. The delay in the construction of the plant was not caused by Hansen nor his associates, but by contractors who had stipulated for the supply of the parts. The entire plant necessarily had to be completed and tested before forged steel car wheels could be made. Hansen's conception was intended to be put to practice upon the completion of the plant for the making of new wheels. It was only at that time that he could have under his personal control presses of sufficient power to treat a worn wheel according to the method conceived by him. That plant was just about, but not completely, finished by the time his application was filed. There was due diligence on Hansen's part in procuring the completion of the plant with which he could test the method conceived by him without running a risk of disclosure to others. The use of steel car wheels at the time Hansen conceived the method was of comparatively recent date. According to the witness Gulick, who testified on the 23d of June of this year, "the only concerns making forged or rolled steel wheels now" are Schoen Steel Wheel Company, the Forge Steel Wheel Company, the Standard Steel Company, and the Midvale Steel Company.

While Hansen could have found presses in other places, as, for instance, in the Bethlehem Steel Company, with power enough to have afforded the pressure required for his method of re-treating worn-out steel wheels, yet it is so doubtful that he would have been afforded permission to have used any of such presses for his own purposes that this court must find as a fact that permission would not have been given him to use the presses without at least a full disclosure of what he intended to use the same for, and it is fair to find that permission would not have been granted him. In the consideration of this subject, it must be found that Hansen's connection with the steel car wheel industry was well known because of his connection with the Schoen Steel Wheel Company prior to his connection with the Forge Steel Wheel Company, and that a request by him to use the powerful press of another would have created a suspicion that it had something to do with forged steel wheels, and might have caused his experiments with the press to be watched.

This court can reach no other conclusion than that Hansen acted with due diligence in endeavoring to reduce his method to practice. He and his associates were investing upwards of a million dollars in a plant intended to be used, not only for the making of new forged steel wheels, but for the re-treatment of old ones. It should not be that, because the double purpose was combined by him, he should be deemed lacking in diligence.

[5] But it is urged that, notwithstanding the diligence of Hansen in perfecting his plant by which the method conceived by him could

be tested, yet because he did not wait to put his method in actual practice, but before doing so constructively reduced it to practice by filing his application, therefore such rights as he had were lost. It is plain that if he had not filed his application but continued his due diligence to reduce his method to actual practice, he would not have been charged with laches until at least a few days after the date upon which his application was filed. Clearly up to the time, therefore, of the filing of his application no laches could be imputed to him. Laches has been defined to be such neglect or omission to assert a right as, taken in conjunction with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar. It has been used synonomously with the phrase "inexcusable negligence and inattention to his interests." It is difficult to see upon what theory the defendant would hold the lapse of time prior to the filing of the application would operate to the prejudice of anybody just because the application was filed prior to the actual reduction to practice. It was but natural that as the plant approached completion Hansen should have filed his application. On this branch of the case the court is of the opinion that laches cannot be imputed to Hansen under all the circumstances, and that he was the first to conceive the method of the patent, and would be entitled to a decree in his favor were the patent valid.

As the patent is not valid, the bill must be dismissed; the costs to be divided equally between both parties.