### HANSEN v. SLICK.

#### (Circuit Court of Appeals, Third Circuit. January 27, 1916.)

#### No. 1953.

1. PATENTS ☞328—INVENTION—METHOD OF REWORKING WORN FORGED CAR WHEELS.

The method of reforging worn car wheels embodied in the Slick patent No. 1,055,672, *held* not to disclose invention in view of the fact that the reshaping is done by the use of the presses previously invented and used to press new wheels from steel blanks and by substantially the same operation.

2. PATENTS ☞51(1)—PATENTABLE "INVENTION"—PRODUCT OF TECHNICAL SKILL.

Modern conditions have made high engineering and mechanical skill ordinary incidents in many industries, and in such highly developed broad arts it is not everything that is beyond mechanical work that is to be deemed invention, but the general public for whose benefit the patent system was created are entitled to the benefit of such technical skill as an incidental advance of commercial pursuits.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 66, 67, 69, 74; Dec. Dig. ☞51(1).

For other definitions, see Words and Phrases, First and Second Series, Invention.]

3. PATENTS ☞51(1)—PATENTABLE INVENTION—MECHANICAL SKILL.

Substantial advance, marked improvement, progressive steps in an art, however beneficial, are not in themselves evidence of invention, but are

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to be expected, and as the art progresses more engineering skill, more mechanical progress, but less invention, are naturally to be looked for.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 66, 67, 69, 74; Dec. Dig. ⊕=51(1).]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by John M. Hansen against Edwin E. Slick. From a decree dismissing the bill, complainant appeals. Affirmed.

For opinion below, see 216 Fed. 164.

James I. Kay, Robert D. Totten, and Kay, Totten & Powell, all of Pittsburgh, Pa., for appellant.

C. C. Linthicum and Franklin M. Warden, both of Chicago, Ill., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] In this case a bill in equity, under the provisions of R. S. U. S. 4915 (Comp. St. 1913, § 9460) was filed by John M. Hansen against Edwin E. Slick. The bill alleged that Hansen was the first inventor of a method of reworking worn forged car wheels, and applied for a patent therefor on June 13, 1908; that he was thrown into interference on certain claims with Slick, the outcome of which was that the Court of Appeals of the District of Columbia decreed said Slick was the first inventor, whereupon a patent was refused Hansen, and patent No. 1,055,672, was granted Slick. The bill prayed that Hansen be decreed adjudged entitled to a patent, that the Commissioner be authorized to issue one to him, and that Slick be perpetually enjoined from asserting any claim to the alleged invention. On final hearing, the court below, in an opinion reported in 216 Fed. 164, held Hansen was the first to invent the method; that he acted with due diligence in reducing it to practice, but that it did not involve invention. It thereupon entered a decree adjudging that as between the parties Hansen was the prior inventor, but that the bill be dismissed "because the subject-matter in issue in this case is not patentable to either of the parties." Thereupon Hansen took this appeal.

As the question of invention is fundamental, it will be first considered. The subject-matter of this controversy is the steel wheel used on railroad cars. In the past the wheels in common use were cast iron; but, with the development and cheapening of steel, the steel car wheel entered into use. Following this, Mr. Hansen and his associates conceived the idea that car wheels could be pressed from blocks of steel in powerful presses. They accordingly designed such presses, obtained patents for them, and began the construction of such presses and works suited for their operation. It was during this designing and constructing period the idea occurred to Mr. Hansen that, as their presses were fitted to initially press a steel car wheel from a block of steel, they were equally well suited to reform or repress a wheel that had been once used, and thereby fit it for use again. As the practice of initially pressing a wheel from a block was well known, it will be apparent that the only thing new in repressing

was the idea of repressing, and not the method of doing it. Whether used to press or repress, a car wheel press operated in the same way. Take, for example, the generic claim for reshaping which was in interference, viz.:

"The herein described method of re-forming a worn car wheel, consisting in heating the worn wheel and forging the same to increase the diameter and reshape the tread and reshape and thicken the flange."

It is evident that the operation here described is precisely the same in function as in original pressing, and the only difference in product is that, when a block of steel is used as the blank, the product is a new shaped wheel; but when a worn wheel is used the product is a reshaped one. In both cases the method and function employed is the pressure of an immobile exterior die to an interior mobile piece of steel; in one case a steel blank, in the other a worn wheel. Moreover, it will be seen that obviously the instant there was conceived the idea of reshaping a worn wheel the invention, if invention there was, was complete, and, with the known ways of pressing car wheels then in existence, there was no call for further inventive originality in finding a way to do it.

It will further appear that the practice of placing some extra reserve metal on some part of the wheel when originally made, which reserve metal could be used to make up for wear, a practice which both parties contend evidences invention, was not a part of the original conception. Turning to the proof, Hansen's testimony shows that, when he got the idea of repressing an old wheel, that and that alone constituted the invention. The test was simply the use of recognized agencies to carry out the plan. Thus Hansen says:

"When the idea of reforging worn car wheels occurred to me, that is, by forcing the metal in the rim outwardly and the hub inwardly, the whole thing was done, as the very die processes which we had been working on and in accordance with which we proposed to make new wheels, would apply to this reforging process. We, of course, knew the requirements of the railroads and buyers of wheels, that is, that they would require different thicknesses of rims and different sizes of bores, and as we developed the die system they were made with this in mind, and as an illustration, take a car wheel which had been made on our 2¼-inch rim dies, the same wheel could be reforged on our 1⅞-inch rim dies."

So, also, in speaking of his telling the witness Bierman of his plan, Hansen says:

"I remember saying to him at the time that the thought occurred to me that by our system of car wheel forging we are able to reforge worn wheels."

Referring to Hansen's first disclosure to him, Christianson, the chief engineer of the Forges Steel Wheel Company, who was preparing the plans for the presses for pressing wheels, says:

"I thoroughly understood what Mr. Hansen had in mind as well as if working drawings had been made for this purpose, and it didn't seem any difficulty whatever to me, inasmuch as the dies we had already designed would do this work. * * *

"Q. 38. Do you mean that you talked this over about making the reforging part of your scheme for making forged steel wheels on the day that you showed him the completed tracing of the tempering device, that is, August 11, 1906? A. I understood it so, yes.

"Q. 39. And did you talk over including this as part of the general scheme at other times after your first conversation on the subject of reforging car wheels? A. Yes, Mr. Hansen brought that question up several times; that is, he would try to reforge a wheel as soon as he had an opportunity to do so. However, this did not impress itself very forcibly on my mind on account of having all the appliances necessary to do his work already designed. In other words, it required no further consideration on my part."

That the subsequent manufacture of the wheel was a process of mechanical detail, the usual process of getting the die and the metal properly adjusted and proportioned, is apparent from Christianson's testimony:

"Q. 55. About when did they succeed in producing a full-sized wheel? A. On the 25th of May, 1908, we got ready to press the first full-sized wheel, and in this first experiment we found that we did not get the wheel complete. There were many imperfections, and amongst other things we did not succeed in getting a full hub; nor did we get a full tread and flange. The web of the wheel was fairly well formed. The broken outline shown on 'Hansen's Exhibit Drawing of First Wheel Pressed' shows the contour shape of the wheel we attempted to make. The continuous irregular line B shows the wheel we made. The line C shows the wheel we finally succeeded in making in conjunction with the broken line. In other words, by change of the dies we took the material as originally forged from back of the rim, such as at D, and caused it to fill the upper part of the die as at E, and we took the metal back of the flange, as at F, and caused it to fill out the flange as at G.

"Q. 56. About when did you succeed in producing a complete wheel, and was it exhibited any place? A. We succeeded in producing the first really perfect wheel about the 10th of June, 1908. I recollect us having to express, or having to send the wheel by express, to the Master Car Builders' Convention at Atlantic City, which opened the 16th of June, 1908.

"Q. 57. Did you have a number of experiments working with the dies and changing their shape to produce what you call the really perfect wheel? A. Yes, we had quite a good many.

"Q. 58. Were any changes made in the size or weight of the blanks? A. Yes, a good many changes were made also in the thickness of the blanks principally at that time. By forging the wheel we found that quite a lot of the material got lost somewhere that we could not account for, and in consequence we did not get full tread and flange of the wheel. To remedy this, and in order to be able to use the blanks provided, we changed the dies so as to increase the thickness of the rim in order to get sufficient material to fill out the tread and flange." * * *

"XQ. 66. Did Mr. Hansen after August 11, 1906, disclose any other or further features of the proposed reforging method than those which he mentioned in the first talk in August, 1906? A. No, there was no other matter talked of, and the subject was to me at all times very clear as to what was meant."

That Hansen's idea was an addition of dies and presses then planned is also proven by Christfield, the mechanical engineer of the company, who says:

"A. About the latter part of July, 1906, Mr. Christianson handed me a sketch showing an idea of Mr. Hansen for a tempering device to temper the tread and flange of wheels by means of water working against the tread and flange. I understood at that time that this device was for the purpose of prolonging the life of the wheel. This sketch I laid aside for the present, as I was very busy designing or working up detail drawings, schemes, etc., of machinery, which was to enter into the manufacture of forged steel wheels. About August 9, 1906, Mr. Christianson came to me and told me to drop everything that I had in hand and proceed with making a drawing for the tempering device referred to. This drawing was completed on August 11, 1906, and is the drawing 'Hansen's Exhibit Drawing August 11, 1906.' On that day Mr.

Hansen and Mr. Christianson were in my office at Butler, and, in speaking of the merits of the device, Mr. Christianson made some objection, stating that he thought that by cooling the tread in this manner it would work hardship on the web of the wheel, in a sense it would weaken the structure at that point. Mr. Hansen then made the suggestion that we reforge the wheels, and in making this suggestion he took his pencil and marked on the tracing the probable wear from service, and also the manner in which we could arrange our dies for reforging. I remember distinctly at the time that he made this remark, and in showing how this could be done, that he said it was an easy matter for us to reforge wheels, as it was practically a part of our process of manufacture, and all that would be necessary would be to increase the upper or central die in diameter outward and decrease the diameter at the hub. The same would apply to the bottom dies, by increasing the diameter of die back of the tire and decreasing the diameter of die at the hub. As stated above, he so marked the drawing.

"Q. 18. What effect did Mr. Hansen say this reforging would have upon the worn wheel? A. He stated that this would prolong the life of a wheel by forcing it to its original diameter. The railroad companies would get more use from the wheels.

"Q. 19. What effect did he say it would have upon the tread and flange? A. I cannot recall him saying just what effect this would have upon the tread and flange, except that by forcing outwardly it brings the wheel to its original diameter and can be returned and placed in service.

"Q. 20. Did he state why he wanted to reforge the hub portion inwardly? A. Yes. The reason for reforging the hub inwardly he stated it would decrease the size of the bore or wheel fit, thereby giving sufficient metal to rebore, and the wheel then could be placed upon the axle from which it was taken."

Christfield also shows the subsequent steps consisted of manufacturing details:

"A. Our first experiment was made on May 25, 1908, as shown in 'Hansen Exhibit Drawing of First Wheel Pressed.' While this wheel did not come up entirely to our expectations, we were pretty well pleased with what we had developed, and proceeded to change the size of blank to enable us to more readily fill the area required to make a perfect wheel."

In the argument of the case, great stress is placed on the fact that, as now made, steel car wheels have a reserve of metal in the web of the wheel which in repressing is pressed into the hub and tire; locating this reserve metal in the new wheel is urged as evidencing invention. But that this was not part of the original conception, but an obvious mechanical expedient, which subsequent manufacturing developed, is shown by the proofs. In that regard the testimony of Christfield is:

"XQ. 44. On August 11, 1906, when Mr. Hansen first disclosed this reforging idea to you, did he say anything about providing an excess of metal then? A. There was nothing said about providing any excess of metal for the purpose of reforging wheels. His idea was, as I understood, that we would take any wheel that we made, and after same had been in service would reforge the wheel, bringing it to its original diameter of tread and flange, filling out the tread and flange to its original line; also, would make the bore or eye of the wheel to its original diameter before same had been worn, by increasing our dies at the back of the tire both top and bottom, and increasing the metal of the same dies at the hub, thereby decreasing the diameter of the hub, this would make the rim of the wheel less in thickness, the diameter of the hub less in diameter, the diameter of the bore or eye of the wheel less in diameter, which would permit boring the wheel and placing it upon the same axle from which it was removed."

In other words, the original dimensions were to be restored, not by using reserve metal, but by the use of dies of increased proportions.

To the same effect is the testimony of Allman, manager of the works, who says:

"A. During the building of the furnaces and the gas flues, Mr. Hansen was in Butler, and during a conversation he mentioned to me that he had an idea for reforging wheels which were worn in service to bring them back to the original diameter. * * * During our conversation, I asked him what his ideas were, and he took a piece of paper from his pocket and sketched off a wheel, and then drew new lines on the inner part of the rim, top and bottom, and the outer part of the hub, which would increase the diameter of the wheel on the inside and decrease the diameter of the hub on the outside, and he said that by using the original sized piercing tool the wheels could be rebored for wheel fit."

The testimony of Bierman, the secretary of the company, makes clear that Hansen's idea was to press an old wheel by reducing the thickness of the rim and then enlarging the inner diameter. In that regard, he says that Hansen said:

"That one of the things that was possible with our method of making wheels was that after a wheel had been worn we could take and use dies for forcing out the rim and of course reducing the thickness of the rim in doing that, and he said that we could take what we called our two or three wear wheel and and reforge it into what we called our one wear wheel or 1⅞-inch rim wheel, and he made a sketch at the time showing what he meant."

His testimony is that Hansen likened his proposed process to the repressing of rails, saying:

"He spoke of it on possibly three or four different occasions, at one time also saying that the same idea could be applied to the reforging of worn car axle, and that a worn rail could also be brought back to its original surface by using rolls, providing in the first place there had been enough metal provided at the back of the head of the rail to permit of doing that."

[2, 3] Did this change involve invention? The question of invention is a relative one and is to be considered, not as an abstract theory, but as a concrete, practical question in a particular art. Modern conditions have made high engineering and mechanical skill ordinary incidents in many industries, and such technical skill is to be regarded as the incidental advance of commercial pursuits. It follows therefore that such advance in the art as results from this skill the public is entitled to avail itself of as a fruit of mechanical growth and advance. In such highly developed broad arts it is not everything that is beyond mechanical work that is to be deemed invention; but the general public, for whose benefit the patent system was created, are also entitled to the benefit of those who are skilled in such art. "Invention" is what rises to a higher plane than skill, both engineering and mechanical. It will therefore be seen that when it comes to a question of monopolizing for 17 years the fitting of worn car wheels to further use, such monopoly should be restricted to such novel acts as are beyond the sphere of skilled engineering and mechanical steps in such art. Moreover, we must not lose sight of the fact that one of the usual way marks of invention is that it generally follows futile ef-.

forts of those skilled in an art to solve some recognized difficulties. Substantial advance, marked improvement, progressive steps in an art, however beneficial, are not in themselves evidence of invention. They are to be expected, and, as the art progresss, more engineering skill, more mechanical progress, but less invention, are naturally to be looked for. It is when skill and progress stop abreast of an obstacle that inventive genius intervenes and invents.

Applying these principles to the case in hand, we are clear that the conception of reshaping steel car wheels, for which Slick and Hansen here contend, was the result of progressive manufacturing thought applied to the new problems incident to the use of pressed steel car wheels. Such wheels had come into use and in many ways had proven their superiority over cast wheels. The objection to them was their cost. The matter of reshaping and reusing steel articles worn by service was new neither to the mechanical arts generally nor to railroad practice in particular. That a steel appliance could be reheated, repressed, and made fit for reuse, was a well-recognized principle in the steel art. It is true that a man might devise some particular kind of heat treatment or some particular mechanical means of pressing, and cover such a particular way of doing it; but for any one to blanket, in any particular steel art, the whole subject of using pressure to reform or reshape worn appliances in that art, would be to retard instead of stimulate advance therein. Yet that is exactly what is sought to be here done, for, taking the claim we have already quoted in substance, it is a sweeping claim for repressing worn car wheels, since it is obvious that no wheel can be repressed unless it is done by "heating the worn wheel and forging the same," and no such pressure can be exerted which, if the die allows it, will not "increase the diameter of and reshape the tread, and reshape and thicken the flange."

Now the use of dies and rolls in the steel art for the general purpose of redistributing metal to fill worn surfaces was well known. The use of steel rails on railroads had already suggested the economic necessity of rerolling worn rails instead of selling them for scrap. This had resulted in building up a rerolling industry that had grown to such proportions as to warrant the court in the United States Steel Case (D. C.) 223 Fed. 55, citing it as one of the factors preventing control over steel rail prices, viz.:

"It will also be noted that the practice of rerolling rails, an industry that has lately sprung into existence (volume 10, p. 4028) and grown to large proportions, enables railroads to have old rails rerolled into lighter sections, has, in its simple mills, created another factor by which the railroads can protect themselves."

Without entering into details, it suffices to say that the general mechanical means used to press a worn car wheel are similar to those used to reroll a worn out steel rail. For illustration, take patent No. 522,228, for a process of renewing old steel rails, granted to McKenna in 1894, 12 years before Hansen. It clearly points out the practice in rerolling of transferring metal from one part of a rail to make up a worn place in another part. Thus the patent says:

"My invention is intended to take advantage of the discovery I have made, which is that, when rails are taken from the track as being no longer serviceable, a very small proportion of the metal has been lost by attrition, but the rails have become unserviceable owing to the displacement of the metal by the blows of the wheels in passing over them. Therefore, in adapting these rails to further use, it is only necessary to replace the metal thus displaced and to reduce the cross section slightly, keeping the rail of a standard height, so that the renewed rail will be adapted to be used interchangeably with original rails."

This patent shows the general problem of rerolling steel appliances had been taken up by railroads, and that its method of doing it involved the practice of redistributing metal. That the mechanical principles used were the same in rerolling a rail, reshaping a car axle, or repressing a car wheel, was recognized by those familiar with the art, and is shown by the testimony of Bierman quoted above, who in that respect said that Hansen, when explaining his conception, said:

"That the same idea could be applied to the reforging of worn car axle, and that a worn rail could be brought back to its original surface by using rolls, providing, in the first place, there had been enough metal provided at the back of the head of the rail to permit of doing that."

In that regard we think the original view of the Patent Office was right, when, refusing to accept this device as involving invention, the Examiner reported:

"For applicant to apply substantially the same method to the reworking of a car wheel which has sufficient metal in any of its portions is considered to be obvious, especially in view of the fact that it is old to rework a rail in order that it may be again utilized."

Moreover, this conclusion is in harmony with other facts in the case. There was no long-felt want in the art, no period of abortive experimenting. As soon as the steel wheel became a part of railroad equipment and the need of some reduction in price to enable it to compete with cast wheels had become a necessity, the situation was promptly met by two independent skilled minds in the art, and that without approach through experiment; Hansen seeing that the patented presses, then designed, for originally shaping the original wheels, could be utilized for reshaping them when worn, and Slick in the same way realizing he could do it by the use of rolls. That two men, skilled in the car wheel art, should each independently, at once and without experimentation, see the feasibility of reshaping worn wheels by substantially the same general mechanical pressing means, is in itself suggestive that the skill of the art was sufficient to meet the situation without recourse to the field of invention; and that Hansen so regarded it, and that he was subsequently forced to patent, in self-protection by Slick's attempt to patent it, is to our mind rather indicated by the proofs. We have already shown by the uncontradicted testimony that when Hansen made his conception in August, 1906, he regarded it as complete and perfect, so that he and those to whom he disclosed it understood it perfectly. Indeed, the presses to carry it out were already designed. That he was then in position to apply

for a patent if he felt he had made an invention, and that experimentation, test, or practical reduction to practice were not prerequisites to an application, is simply and uncontrovertibly shown by the fact that without any such acts he subsequently did apply for a patent in 1908. In view of these suggestive facts, we incline to the view that Mr. Hansen merely regarded the reshaping of worn car wheels as a further use and possibility of the great presses they were then constructing, and that Slick's subsequent attempt to patent worn car wheel reshaping and blanket the whole art, drove Hansen as a self-protecting step to show that if, as Slick contended, the device involved invention that he (Hansen), and not Slick, was the first to conceive it. Indeed, the attitude of mind of one who believed he had made an invention, and that he would patent it, is not testified to as being Mr. Hansen's when, as Christfield testified, Mr. Hansen told him of his idea, left a drawing embodying that idea with the witness, with the remark "that I should keep this idea in mind and at some future date, when we had an opportunity, to reforge worn wheels that had been in service, we would then give the idea a test."

It must not be overlooked that this case is one which calls for close scrutiny by a court before decreeing the validity of either Slick or Hansen's claim to patent monopoly. Both of them are interested in asserting the device involved invention, and no one before the court is interested to contest it. Standing as the court must under such circumstances as the only protection this great art has, to see it is not subjected to unwarranted monopoly, we have felt constrained to set forth our views at length in support of the very able opinion of the court below, instead of affirming the case, as we might well have done on that opinion. Without quoting at length from such opinion, we may say we concur with the views expressed by Judge Orr when he said:

"It is, of course, beyond question that the reshaping of old car wheels to allow of their use in the same manner as new wheels are used and in association with new wheels is of great value. The measure of economy, while not definitely fixed in the evidence, must surely be great. It is true that the treatment of worn out car wheels does not appear to have been adopted, or even considered as feasible, until about the time the parties to this suit filed their applications in the patent office. This court has concluded that the reason for the failure to reshape worn out car wheels was the doubt that existed as to the durability of the reshaped wheel. This is fairly found from the evidence when taken in connection with the disclosures of the prior art.

The retreatment of metal articles, which have already been subjected to heavy use, has always presented the problem as to whether or not, after retreatment, the mechanical and physical properties of the metal remain the same. In other words, it was doubted whether a different crystallization or a different chemical relation might not exist in the retreated article which had not existed in the article as originally made. Such doubts could only be resolved by careful tests, and especially by the important test of use. So far as the flow of metal is concerned, no doubt has ever existed that metal at greater or less degree of heat would flow under pressure. * * *

"The evidence discloses that used articles of steel and iron have been re-treated to bring them again to the necessary length, and that others have been re-treated to bring them again to the necessary width. That others again may be brought to the same circumference was to be expected. A

search of the patent for something peculiar in the treatment proposed by the patents is in vain. The used wheel 'is reheated to the ordinary forging or rolling temperature.' Pressure is then applied as needed. If the process of rolling be used, the pressure of the rolls is given as required. If the process of forging by dies is used, the same is true.

"In the consideration of the question here presented with the utmost care and with a realization that all the witnesses called were favorable to invention, yet the court cannot find anything substantially new in the patent. The use of great presses is old. The use of dies with different shapes with which the pressed metal is bound to conform is old. The only thing that is new is the fact that people began to use old processes in order that old wheels may be renewed and subjected to a longer life. The treatment of worn out car wheels, was a mere step in the art of subjecting metals under pressure to force them to reach the desired dimensions. That such treatment has resulted in great economy should not control the judgment of the court upon the question of invention. * * * It is therefore the duty of the court to dismiss the bill because invention is not found."

The decree below dismissing the bill on the general ground the patent lacks invention will be affirmed. This view renders it unnecessary to decide the question of priority between the parties.