John A. Dienner, Robert R. Lockwood, and Edward C. Grelle, all of Chicago, Ill., for appellants.

Charles W. Hills, Jr. and Charles F. Meroni, both of Chicago, Ill., for appellee.

Before MAJOR, MINTON, Circuit Judges, and LINDLEY, District Judge.

**TRIPLETT et al. v. LINE MATERIAL CO.**
**No. 8105.**

Circuit Court of Appeals, Seventh Circuit.
Feb. 8, 1943.
Rehearing Denied March 22, 1943.

LINDLEY, District Judge.

Plaintiff corporation, owner of application of Triplett 758,372, filed December 30, 1934 and of that of Lindell 70,280, filed March 23, 1936, each for improvements in electrical fuses, and the applicants therein, appeal from a judgment entered in a proceeding under Section 4915, R.S., 35 U.S.C.A. § 63, adjudging each application void for want of patentability and dismissing the complaint for want of equity. They contend that the court unjustifiably exceeded its authority in redetermining the question of patentability and found the applications void; that the evidence supplied a rational basis for a finding only that the claims are patentable and that the court improperly found Lindell's claims void on the premise that products made in accord with its teachings were on sale more than two years prior to his filing date.

The Commissioner, as the result of an interference proceeding, refused patents upon both applications, awarding priority of invention to one Steinmayer, whose application was owned by defendant, and to whom the patent issued. The Commissioner held the claims patentable over the prior art but found that Steinmayer was the first inventor. Thereupon plaintiffs filed this suit, seeking judgment that they were entitled to receive patents for the inven-

534

tions, as provided in the statute. That Act provides that where application for patent is denied, the applicant may have a remedy in equity wherein the court may adjudge that he is entitled to receive a patent. In its amended answer defendant not only pleaded priority of invention by Steinmayer but also asserted that the claims do not cover patentable subject matter.

■ Plaintiffs contend that it was the duty of the court, under the language of Radtke Patents Corporation v. Coe, 74 App. D.C. 251, 122 F.2d 937, to determine only whether a "rational basis" existed for the Commissioner's decision. Defendant contends, and the District Court held, that it was the province of the court, under Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 230, 33 L.Ed. 502, to determine first of all whether the applications disclose patentable inventions. This, we think, is correct. In Hill v. Wooster, supra, the court announced that, under the pertinent section of the Act of Congress, "no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention. * * * A determination of that issue alone, in favor of the applicant, carrying with it, as it does, authority to the commissioner to issue a patent to him for the claims in interference, would necessarily give the sanction of the court to the patentability of the invention involved. * * * Neither the circuit court nor this court can overlook the question of patentability." In other words, applicants, seeking relief under the statute, must present to the court evidence showing that they are entitled to receive a patent before they can have a judgment awarding such relief. If their claim and the evidence submitted disclose no patentable invention, obviously they are entitled to no relief. It is the proper function of the District Court and its duty to inquire into and determine whether the complaint is endowed with equity in this respect.

■ Inasmuch as the District Court, properly following this rule, found that the applications disclosed no patentable invention, our duty is to look to the evidence to determine whether the conclusion is justified.

The parties having agreed that the claim of Triplett known as Count I and that of Lindell known as Count 4 are typical of the several claims, they are reproduced in the footnote.[1] Each applicant petitioned for a patent for a replaceable fuse link, comprised of (1) a fuse tube (a container); (2) a relatively infusible terminal at one end of the tube for connection to one line terminal; (3) another line terminal at the other end; (4) fusible means connecting the two terminals; (5) a coil spring inside the tube, anchored at the lower end and arranged to "bias the terminals apart"; (6) a flexible conductor. Lindell added a washer near the bottom of the tube to be utilized as an anchor for the spring.

■ Such fuse links are utilized in effectuating cut-out or arresting means to protect distribution transformers supplying residential lighting loads from overloads and short circuits. These transformers usually reduce the voltage of incoming current from 2300 volts to 110 volts for domestic purposes. The fuse link is interposed in the circuit to melt or blow out and thus break the circuit, in case of overload or short circuit. By the fusing of the "fusible means" connecting the two terminals of the link, the circuit is broken and further damage from the short circuit or overload avoided. The fuse should be built so as not to blow out except when necessary; otherwise it will interrupt the steady flow of current. And equally ob-

[1] Triplett Count I. A replaceable fuse link for interconnecting a pair of line terminals comprising, a fuse tube, a first relatively infusible terminal at one end of said fuse tube for connection to one line terminal, a conductor including a second relatively infusible terminal and a flexible lead extending out of the other end of said fuse tube for connection to the other line terminal, fusible means interconnecting said terminals, said conductor being freely movable out of said fuse tube on blowing of said fusible means, and a coil spring inside said fuse tube and anchored at the other end thereof and arranged to bias said terminals apart.

Lindell Count 4. A replaceable fuse link comprising a fuse tube, a terminal at one end of said tube, a conductor extending out of said fuse tube including a terminal and a flexible lead connected thereto, a fusible section interconnecting said terminals, a coil spring inside said fuse tube tensioning said fusible section and compressing said fuse tube, and means substantially uniformly distributing the stress of said spring as applied in compressing said fuse tube.

viously, to prevent spreading damage, it should be so constructed as to blow out immediately in case of overload or short circuiting.

Fuse links are old. They have been essential in efficient distribution and reduction of electric current ever since the latter became a household convenience. Those utilized have long embraced substantially every element included in the devices of the applications. Thus in all fuses there are terminals connected by a fusible substance. This elemental construction is of the essence of the utility of the fuse. When one considers the purpose of the device, the reasons for its efficiency, namely, the presence of a fusible element connecting the two terminals, it is obvious that utility and efficiency require that the terminals shall be of substantially relatively more nearly infusible material than the connecting fusible means, which the user contemplates will be destroyed by a blow-out. Equally within his contemplation, terminals and other parts will not, must not, be fused or destroyed. Hence they must be relatively less fusible.

Plaintiffs claim that Triplett achieved invention in contribution of "a universal fuse link which was self-contained and had precision of operation built into it irrespective of the tube in which it was placed and without regard to the kind of mounting." But in his claims no new elements are found. The terminals, the fusible means connecting them, bringing in and passing out the normal current, were all old in the art. And we think, too, the District Court properly concluded that the use of a spring inside the fuse tube was old. Triplett provided such a spring, anchoring it so as to place the terminal under tension, the purpose being to have it function so as to separate quickly the terminals of the link in case of fusing and thus prevent extension of damages from the overload or short circuit beyond the fused material. But the prior Kearney link included such a spring, serving the same purpose, in substantially the same manner. His spring was anchored, not by a washer, as Lindell prescribed, but by being hooked to the wall of the tube. Triplett himself described no special means of anchoring but Lindell suggested a washer to serve as an anchor, located near the bottom of the tube, supporting the entire base of the spring. Kearney employed no such base but fixed the end of the spring near the bottom of the tube by hooking it into a hole in the wall of the tube. Thus the spring was anchored at one point of its circumference instead of on its entire periphery. But this did not constitute invention. The change from hook to washer was the obvious expedient of a skilled mechanic and effectuated no new function or utility.

That applicants were familiar with Kearney's teachings is apparent from a letter written by Lindell on October 6, 1938, in which, speaking of the interference then pending, he said that on September 19, 1933, he and Triplett knew about the Kearney device, "having a tension spring anchored at the other end of the tube" and he and Triplett, in their testimony, admitted knowledge of the construction prior to filing their applications. Apparently all that Triplett and Lindell did in this respect was to redesign the link disclosed in Ramsey 2,144,707, anchoring Kearney's spring inside the tube as he did. No invention lay in what they specified.

Plaintiffs contend that the applicants were the first to prescribe relatively infusible terminals but we think that if, in order to negative patentability it was necessary to have such prior disclosure, Ramsey supplied it. We are rather of the opinion that it is perfectly obvious to an electrical worker that, to prevent damage spreading when the fusible means fuses, it is essential that the terminals which the fusible means connects be of relative infusible character so that the force destroying the fusible means will not also destroy the terminals and that it was not invention to specify relatively less fusible material for the terminals. But if the suggestion was essentially inventive it had been taught by the prior art.

Lindell in his application added nothing except the washer or anchoring means of which we have spoken. He abandoned the anchoring hook and adopted an anchoring washer; this, we think, was not invention. We think both applicants did nothing more than utilize the construction of Ramsey, putting inside the tube the spring as taught by Kearney and substituting for Kearney's hook Lindell's washer. This improvement may have proved practical, desirable and popular, but, it seems to us, is clearly the expedient of a skilled mechanic in the art.

Plaintiffs contend that Lindell's washer contributes a so-termed "non-cumulative feature"; but we find no such teaching in his claims. If it is any where connoted, or necessarily results from Lindell's con-

struction, we think the feature is disclosed in Steinmayer 1,952,635.

In view of the facts mentioned and further evidence in the record which we do not deem it essential to refer to, the District Court properly held the claims embraced in the two applications not patentable. In view of our conclusions, it is unnecessary to discuss the issue of priority or that of invalidating sales.

The judgment is affirmed.