MINNEAPOLIS-HONEYWELL REGULATOR CO. et al. v. MILWAUKEE GAS SPECIALTY CO. et al.

Civ. A. No. 1153.

District Court, E. D. Wisconsin.

June 9, 1948.

Will Freeman, George Fisher, W. M. Van Sciver and Bair & Freeman, all of Chicago, Ill., for plaintiffs.

Arthur H. Boettcher, C. Lyman Emrich, Jr., and Brown, Jackson, Boettcher & Dienner, all of Chicago, Ill., for defendants.

DUFFY, District Judge.

This is a suit brought under R.S. § 4915, 35 U.S.C.A. § 63, and is an inter partes action. Defendant Thornbery's application for patent was filed August 22, 1935. Plaintiff Kronmiller's application was filed June 27, 1936. Although co-pending for more than three years the Patent Office, by inadvertence or otherwise, did not declare an interference. Patent 2,183,827 was issued December 19, 1939, upon Thornbery's application, and thereafter an interference (No. 77993) was declared.

The counts or claims here in question (12 and 13) originated in the Thornbery application, having been presented (as Claims 25 and 26) by an amendment filed January 30, 1937. They read as follows:

"Count 1. (Claim 12 in Thornbery patent)

"In combination, a fluid supply conduit, a valve for controlling the supply of fluid through said conduit, a movable armature operable to control said valve, an electromagnet for said armature, a thermocouple connected to said electromagnet for energizing said electromagnet, means for resetting said armature with respect to said electromagnet, and means operable to shut off the supply of fluid through said conduit during the resetting operation.

"Count 2. (Claim 13 in Thornbery patent)

"In combination, a main burner, a fuel supply line for said burner, a pilot burner for said main burner, valve means in said fuel supply line for controlling the supply of fuel through said line, a movable armature operable to control said valve, an electromagnet for said armature, a thermocouple in proximity to the pilot burner and connected to said electromagnet for energizing said electromagnet by the heat of the pilot burner, means for resetting said armature with respect to said electromagnet, and means operable to shut off the supply of fuel through said fuel supply line during the resetting operation."

The important part of each of said counts for our consideration is the last clause, to wit: "and means operable to shut off the supply of fluid (of fuel) through said conduit (through said fuel supply line) during the resetting operation."

Portions of both counts include subject matter developed by others prior to any activity in this field by either Kronmiller or Thornbery. Dr. Karrer developed a thermoelectric safety valve shown in Patent No. 2,097,838, dated November 2, 1937, upon application filed June 30, 1931. The Karrer development was carried on by the Consolidated Gas Electric Light & Power Company of Baltimore, Maryland. The entire development by Karrer and Consolidated was taken over by the defendant, Milwaukee Gas Specialty Company. The structure of such development became known as "Baso," and was used with hot water storage systems employing a gas burner and a thermoelectric safety valve. A description of such an installation is as follows: The thermoelectric safety valve is placed in the fuel line leading to the burner. It includes an electromagnet connected to a thermocouple. When the pilot light is lighted the flame is in contact with the thermocouple and this produces sufficient electrical energy to energize the electromagnet. When thus energized it retains an armature and the valve in the fuel line is thus held open to allow fuel to flow to the burner. If the pilot flame is extinguished the electrical energy terminates and the armature drops, thus closing the valve in the fuel line. The electromagnet when energized is not sufficiently strong to attract and move the armature from a position spaced from it. There-

fore, the safety valve must be reset manually by moving the armature into engagement with the electromagnet and if the pilot flame has been relighted, sufficient electrical energy is produced to hold the armature in engaged position and the gas may then flow to the main burner. During the resetting of the thermoelectric safety valve a dangerous condition is present, because there may be an accumulation of gas after the time when the armature has been manually placed into engagement with the electromagnet and the valve thus placed in an open position.

Both Thornbery and Kronmiller set about to provide an additional safety feature to the already developed thermoelectric safety valve. Thornbery recognized the danger that had to be overcome when he stated in his patent, "If the switch or other control device is operated to set up the supply of fuel to the main burner when the resetting device is operated and irrespective of whether the pilot burner is lighted, fuel may pass to the main burner and escape and collect unburned. This unburned gas presents the danger of asphyxiation and possible explosion when a flame is applied to light the pilot burner." He then stated his objective, as follows: "The object of the present invention is to provide means which will permit resetting and holding the armature in contact with the pole faces of the electromagnet without setting up the supply of fuel to the burner, and, particularly, means which will permit resetting and holding the armature in contact with the pole faces of the electromagnet without setting up the supply of fuel to the burner until the pilot flame has been relighted and a thermoelectric current set up to hold the armature in contact with the pole faces of the electromagnet."

The interlock wherein fuel is prevented from flowing to the main burner until the resetting operation has been completed is shown in Fig. 2 of the patent drawing. In order to reset the armature it is necessary to engage the resetting button (54) and move it upwardly until it establishes a contact between the disc (56) and the elements (57) and (58). However, the flow of gas to the main burner is still prevented because there is no electrical connection between elements (61) and (63). When the reset cap is again placed in position its metal band (94) bridges the gap between the elements (61) and (63), completing the electrical circuit. Thus Thornbery's arrangement is such that the act of resetting in itself brings into operation a means for preventing the flow of fuel to the main burner until after the resetting has been completed.

After the interference was declared the Patent Office asked for preliminary statements. Such a statement is in the nature of a pleading, containing principally allegations with respect to dates. Kronmiller's statement was that he made the invention in January, 1935, and actually reduced it to practice in March, 1935. Thornbery's statement alleged that he made his invention in May, 1935, and actually reduced it to practice in July, 1935. Thornbery swore to his statement on March 14, 1940; however, more than three months later Thornbery swore to an amended preliminary statement declaring his invention was made June 19, 1934, and was actually reduced to practice July 25, 1934. A stipulation has been entered into herein that as to the interlocking type of device Thornbery has a date of June 1, 1935, and Kronmiller has a date of March, 1935. As to the manual petcock type of device Thornbery has a date of June 19, 1934.

The decision of the Examiners of Interference stated, "We are of the opinion that the meaning of the counts is clear and unambiguous so that reference to the Thornbery disclosure and to the prior art cited therein is not necessary," and priority was awarded to Thornbery. Thornbery's date earlier than Kronmiller's is based on the Baso device, plus a manual petcock. The question to be here decided is whether the counts here in issue can be satisfied by a manual petcock device.

It is quite apparent that when Thornbery filed his application for patent he had in mind only the interlocking type of device. The language of the claims can only be satisfied by such a device; the language of the patent heretofore quoted demonstrates his idea; the state of the prior art requires the counts to respond only to an interlocking type of device.

Also, I think it of some importance that the manual petcock is not shown in the Thornbery patent.

When Thornbery spoke of the danger of accumulated gas during the resetting process, he had in mind eliminating the human element for error. The manual petcock, of itself, does not do anything. It is not a safety factor if the operator forgets to close it, or accidentally knocks against it and opens it after it has been closed. The manual petcock would not uniformly overcome the danger that Thornbery speaks about in his patent. But in the interlocking arrangement, the human element is not the determining factor whether gas may flow to the burner during the resetting operation. The act of resetting automatically prevents the flow of gas until the resetting operation is completed. In both counts the words "during the resetting operation" are of great significance.

It is my opinion that Thornbery cannot now say that notwithstanding his first preliminary statement, notwithstanding the disclosure of the patent specifications, and notwithstanding the drawings of the patent the two counts in question are satisfied by the manual petcock device. The counts in interference are not supported by the manual petcock device installation made by Thornbery in 1934.

However, defendants insist that in an action under R.S. § 4915 the court has no jurisdiction to pass upon the validity of a claim in a patent, and cite Smith et al. v. Carter Carburetor Corp., 3 Cir., 130 F.2d 555, 560, and Cleveland Trust Co. v. Berry et al., 6 Cir., 99 F.2d 517, 521. I cannot agree with any such categorical statement of the law. This court cannot decide the question of priority of invention in a vacuum. It must determine first of all whether the applications disclose patentable inventions. Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228 page 230, 33 L.Ed. 502. The Supreme Court in that case said, page 698: "* * * It necessarily follows that no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention. * * *"

It is true that in Hill v. Wooster, supra, a patent had not been issued to either of the interfering applicants, but the rule of that case was later followed by the Circuit Court of Appeals of this circuit in a case where a patent had been issued to one of the parties. Triplett et al. v. Line Material Co., 7 Cir., 133 F.2d 533.

Even in Smith et al. v. Carter Carburetor Corp., supra, cited by defendants, the court said (page 557 of 130 F.2d): "While the primary question in interference proceedings is the determination of priority of invention, other pertinent questions may be incidentally involved. * * * The interference proceeding in the Patent Office, * * * presupposes respective claims by two or more adverse parties to substantially the same patentable invention and the proceeding is carried on for the purpose of determining the question of priority of invention as between them. * * *"

Although it was not the intention of Congress in enacting R.S. § 4915 to transfer the function of the Patent Office to the District Courts (Cherry-Burrell Corp. v. Coe, 79 U.S.App.D.C. 124, 143 F.2d 372) yet in determining priority of invention it is necessary for the court to determine the scope of the claims in issue (General Electric Co., et al. v. Steinberger, D.C., 208 F. 699, affirmed 2 Cir., 214 F. 781).

Defendants argue that the claims are unambiguous and must be given the broadest interpretation which they reasonably will support. But the defendants' interpretation of the claims before this court demonstrate that they are ambiguous. Otherwise defendants could not contend for a construction that was apparently not in contemplation when the application was filed.

I conclude that the counts or claims in question should be construed in the light of all the facts; they should be read in the light of the disclosure and the prior art, and the claims must be directed to an interlocking type of device. I conclude further that there is a patentable

combination in the claims and that the inventive step was first made by Kronmiller. Plaintiffs are entitled to a decision awarding to them the subject matter of the two counts or claims.